Let us know who you are and who you represent. Gary Feilreisel for Defendant Appellants JMS Trucking and Sam Navino. Good morning. Good morning, Your Honors. Martin Healy representing the State of Palo Alto. And Anthony Tashnider representing the Third Court Defendant of Benchmark Construction. All right, so we'll split up 15 minutes for each side. Does that work for all of you? Judge, frankly, with regard to the Third Court Defendant, the issues directed on the appeal to my client are limited. Yes. So it's my intent to be very brief and yield the remainder of my time to the plaintiff. Okay, sounds good. Fine. Great. You may begin whenever you're ready. The Police Court. Again, Gary Feilreisel for the Defendant Appellants JMS Trucking and Sam Navino. As you know from the briefs, Your Honors, this is a case of very contested trial liability and damages-wise. The position of the defendants that there were numerous errors made by the trial court, maybe in and of themselves, individually, might be considered harmless. But when combined together, it's the defense position that those errors resulted in prejudice to the defendant and warrant a new trial. I've addressed several arguments in my brief. In my argument today, I want to, if time permits, address all of them, but definitely several of them. The first being the testimony of Richard Brennan, plaintiff's 213F3 expert. The trial court denied our motion in limine on Mr. Brennan's testimony. It was our position that he was not a 213F3 expert, did not qualify as a 213F3 expert, and did not have the qualifications to do that. He testified, especially based on his experience as a truck driver. He hadn't had a CDL license, a commercial driver's license, for I think somewhere in the area of about eight or seven years of time at trial. Had driven a truck for that same period of time. Had driven a truck previously for many years. And essentially his testimony, from our point of view, was not anything that an ordinary juror could not understand. It didn't add anything to the trial. And it basically, plaintiff basically used Mr. Brennan to mimic their case or to funnel the theory of their case right to the jury. And his testimony, other than doing that, didn't really add anything and didn't provide a 213F3 expert testimony. But you got a chance to cross-examine Mr. Brennan and go after all of us, right? I did. I did. And it's our position that the position I took in my motion in limine went to the admissibility of the testimony not to the witness. I did the best I could with him on cross-examination after it was the court rule that he could testify. And it qualifies a 213F3 expert. Counsel, when he testified, did you object at any point during his testimony? I objected. Yes, I did object. I didn't object continuously. No, I objected at some points of his testimony. Did you object before his testimony began? I don't believe I did. I believe that his testimony was he was one of the first witnesses at trial, right, and the judge had reserved her ruling on motion limine and took it up again right before he started trial. And it was at that point that he testified very shortly thereafter. So, no, I don't believe I objected to his testimony in total before he even started. What is your best case for the proposition that professional experience is not a sufficient basis for expert testimony? Well, I think that the case that I cite with respect to his testimony, well, as far as experience, I'm not trying to argue necessarily that just experience is not sufficient to do that. I'm arguing that what he testified to in this case did not rise to the level of expert testimony. In other words, he testified. You don't have any problem with him on the basis of not being sufficiently experienced to render the opinions he rendered. What you're saying is that the opinions that he rendered were not of an expert quality. In other words, the jury didn't need them to be informed. Correct. And basically, I mean, his testimony was essentially that the driver of the truck, Sam Indendino, should have walked around the truck, should have looked in his mirrors. If he would have looked in his mirrors, he would have seen Mr. Colella, things of that nature. And that is something that, number one, Mr. Indendino, I believe, testified to that as well. But secondly, it's not testimony that a jury should hear from a quote-unquote expert when it's something that doesn't rise to that level. And so even though Mr. Indendino would have testified to it, the fact that Mr. Brennan testified to it in his position as an expert witness, I believe gives it more weight in front of a jury. A jury would give that more weight than anything else from a layperson. With respect to a couple of specific points of Mr. Brennan's testimony, specifically with respect to his testimony regarding the Secretary of State's CDL study guide, number one, there was no evidence that he ever had a CDL in Illinois. Number two, basically he said, yeah, that's what truck drivers study. And at trial, the book was held up in front of the jury. Without there being some showing that there was something in that book that applied to the issues in this case, to me that's prejudicial testimony. It's evidence that's not relevant. It's evidence that shouldn't have been allowed. A jury sees a book with 150 pages that a driver has to study in order to pass a CDL test. I don't know how many pages the book for a regular driver's license automobile is, but the fact of the matter is there was nothing that Mr. Brennan testified to from that book that was violated by my client. So to just be allowed to say, yeah, that's what a truck driver studies to get his CDL, and that's what he would have read is irrelevant and prejudicial. But he never said that an endino violated the CDL, did he, the book? No, no, he didn't. But I think that's what the implication is. Yeah, I understand. There was no testimony. There was no testimony. The second specific thing with respect to Mr. Brennan's testimony is his basically just reciting portions of the JMS safety manual. And he wasn't, I don't believe, qualified as an expert in that area, number one. And number two, all he did was read portions of the safety manual to the jury. Now, again, Mr. Endino, when he testified, said, yeah, that wasn't his safety manual. I had to follow the safety manual. But when you have it coming from a quote, unquote, expert witness, I believe that that gives it more substance in front of a jury. When you have an expert witness, and really all he did was say, yeah, page so-and-so, this is what the JMS safety manual says, a couple, three times. So for those reasons, we feel with our position that Mr. Brennan shouldn't have been allowed to testify at trial. And the specific objections that we did make during his testimony should have been sustained. Second point I wanted to move to was the deposition or the trial testimony of Officer James Mullen. Officer Mullen was from the Major Accident Investigation Unit, not an accident reconstructionist. And essentially, there was a long sidebar during trial as to whether his report, which I believe is a police report, the self-determinant report to the initial traffic crash report, it's a police report and it does not fall into the business records category. The Supreme Court rule that we cite, Specific 236, I believe, specifically excludes police reports from that. The court, the trial court, was basically ruling directly opposite to that and telling the plaintiff attorney to lay a foundation for a business record and that he'd be able to testify from it. And what he ended up doing after that is reading, essentially, a number of witness statements to the jury. So-and-so said this, D'Andrea said this, Fiodorosa said this. And, again, I understand that those witnesses all testified and they were asked questions about the statements they gave to the police. And that's where that testimony should have come from. It shouldn't have also come from Officer Mullins, who had no real independent recollection of this. It's not a business record, so he shouldn't have been allowed to read from a document like that. But did they use it to refresh his recollection? Is that what happened? Well, I think when you- He had no independent recollection of it. Did they use it to refresh his recollection? I believe if you use a document to refresh your recollection, then you can't read from it when you're done. You can look at it, you refresh, and then it's put down and you can't- Is that what happened here? Is that what was used to refresh his recollection or not? I don't believe so. I believe he had the document, he had his report in his hands during his testimony, and he was-and what did Fiodorosa say about this? And then he would look at the statement and he would answer the question. There was also, with respect to his testimony, objection about him voicing conclusions that he reached. And I know that right at the end of his testimony he was asked about a conclusion. The objection was eventually sustained. He didn't give that conclusion. He had given another conclusion about he didn't think that a certain part of the underside of the truck came into contact with Mr. Colella's body. And it's our position that that shouldn't have been allowed into evidence either. He didn't have a basis for that conclusion. So I think when you add all of Officer Mullen's testimony together, it becomes-most of it, I believe, because his report was not a business record, it becomes irrelevant. It's inadmissible and he shouldn't have been allowed to testify to it. The next point I wanted to make was with respect to the damages that were awarded. The damages in this case were under two counts, both with respect to pain and suffering, conscious pain and suffering allegedly suffered by Mr. Colella before he died, and then wrongful death damages. It's our position that both of those awards were excessive. And obviously we talked about the standard that's followed in determining whether an award is excessive, and I acknowledge that a jury is given latitude in coming to that conclusion or to their verdict. But in this case, you've got, for about three minutes after the accident, an award of $1 million. The standard being whether that amount is beyond the flexible range of what is reasonably supported by the facts where it's so large it's a shock to the judicial conscience. And I will acknowledge that typically an appellate court will not compare other cases with damage awards to this case. I do cite two or three or four cases in my brief just as examples, and it's hard to-I guess it's hard to put into words, but three minutes of pain and suffering, and I understand what the graphic nature of the injuries are that the plaintiff talks about in their brief. A million dollars for three minutes of pain and suffering. I couldn't find a case that came anywhere close to that in terms of an award. And the one case I do cite that was a million-dollar award that was affirmed was, I think, 24 or 26 hours of pain and suffering before the plaintiff in that case died. Here we have three minutes. With respect to the lawful death damages, it's essentially the same argument. Mr. Colella had a life expectancy of about 20 years, a work expectancy of, I think, another four or five years, and with his lost wage portion of that was, I think, $244,000. The remaining loss of society was about $8 million. And, again, for a man of that age, I understand the plaintiff's arguments about the closest of the family and the evidence that was at trial of that. But it's our position that an award of $8 million, in this case, for the wrongful death damages, the pecuniary loss damages, the loss of society damages, is excessive and is an award that shocks the judicial conscience or should shock the judicial conscience. The next point I wanted to make was with respect to our case versus benchmark construction, the third-party defendant. There was an argument in our motion, or in third-party defense motion, Lemney, regarding our not disclosing 213F2 or 3 experts. It was our position that all of the people who testified in the case and who were going to testify in the case on this issue, on the issue of benchmarks, duty, death sites, reasonable care, and running this construction site were disclosed. They were deposed. And, essentially, they were all witnesses that were going to be called by the plaintiff. And they were called by the plaintiff. To limit cross-examination of a witness is not proper under Rule 213, according to the language of Rule 213. And I acknowledge that we were able to get some of that evidence in, in various ways, but we weren't allowed to, I think, go explore or get into more detail about some of those issues. And, specifically, one of the issues with respect to – and Wayne Crew was the main witness on this point. And there was argument about whether I was limited in what I asked Mr. Crew. There was – when I asked him a question regarding was there something wrong with somebody positioning themselves in front of the rear wheels of this truck that would be improper, that I was objected to, was stricken from the record, the answer was stricken from the record. And then I was told to go on to a different area with his cross-examination. And that was the crux of our case with respect to benchmark. And although we were able to get some of that evidence in at trial, it's our position that we shouldn't have been forced by the trial judge at that point where I was when the objection was sustained to go on to a different area. I should have been allowed to continue with that same line of questioning and get into it in more detail. With respect to the verdict the jury rendered of 0% fault to benchmark, that in our opinion and based on the evidence should be set aside. The evidence that we were able to get in with respect to Mr. Crew was that it was his job to make sure that the job was run safely, to supervise his own employees. He put himself in a position where he couldn't see what his men were doing. He was down in the corner of the street looking at something else and he couldn't see what they were doing. Couldn't see where Mr. Colella was, although he acknowledged, I believe, at one point in his cross-examination that it would have been improper for him to be in front of the wheels of the truck when it was where it was. So he put himself in that position as the supervisor of that crew to not be able to see what his men were doing and also to acknowledge that what he in fact was doing would have been improper. When you add all those things together, the fact that the jury came to the conclusion that there was no negligence on the part of benchmark does not square with the evidence and warrants that verdict being set aside, the 0% liability of the benchmark being set aside. I believe that my time has sped up, so I will rest on my brief with respect to the remaining arguments that I wasn't able to address.  Thank you, Counsel. Good morning, Congress. Martin Healy representing the State of Colella. In this particular case, Counsel chose not to file a reply brief and I believe he has waived the thrust of our argument and that is that as to many of the issues he raises, there was no objection and there was no showing of any prejudice. There really hasn't been a response to that and I think our brief should stand on those issues. I'm concerned about the omission of the police report under the theory that it's an exception to the business record. It wasn't being used as past recollection recorded, was it? There was some past recollection recorded aspect to it. Obviously, the past recollection recorded, that then would allow the witness to read actually from the report itself. Correct. As opposed to simply refreshing one's recollection. Someone says, you know, I can't remember it, I can't recall all that, then you can go through the foundation which historically would include a business records foundation situation such as this and allow a past recollection recorded foundation to be established and then allow the witness to read from the report. But I just, I have some question about how that report is admitted as a business record. How it? How it became admitted as a business record. Well, Your Honor, it was in for a number of reasons and the context of the report, that was done at the end of the evidence. During the course of the use of the report, it was done for various reasons to refresh and really at the end of the case, end of the evidence, went through the various exhibits and I believe that was the first time that there was an objection to the, let me just check the, first time there was an objection to the police report. There wasn't any objection during the testimony of the officer? No. Because it was being used for past recollection reported? As to the report, there was no objections during. The important thing, I think, is that it was never published to the jury. Never published to the jury? Never published to the jury. So it went in as an exhibit? The jurors had the exhibits? No. No, Your Honor, I believe that's the real crux of this issue. It was done at the end of the evidence. There was a motion to admit it at that point. There weren't objections during the course of trial. It was never published to the jury and it did not go back to the jury at the end of the case. So I think based on that, there is no showing of any prejudice in this case as to the police report. But just so I'm clear, it was a police report, correct? It was not a business report? Your Honor, it was a police report and then there was a supplemental report, which was basically- Was that a police report? Was that prepared by the policeman as well? Yes, it was, Your Honor. So was that a police report? Well, Your Honor, there have been some distinctions made on where there are witness statements contained in a document and just witness statements. But it wasn't prepared by Benchmark? No, it was not. No, it was prepared by the Chicago Police Department. Well, tell me what it was used for. That's what I'm unclear about. The witness could not recall what the witnesses said or what these people he interviewed said. Correct. So then you used it to refresh his past recollection that had been recorded. Right. So he looked at it and then you put it down and he testified or he read from it? I believe he read from certain portions of it, Your Honor. There was no objection at that point? No objection. So he was reading from it and nobody was objecting? Correct. There were objections on one issue and that was when there was a question as to conclusions. What conclusions did you arrive at? And there was an objection and at that point there was a sidebar and it wasn't real clear because there was no record on it. But there were no conclusions given by the officer. There was another question as to opinions and that question was withdrawn by plaintiff's counsel. So there were no conclusions or opinions of the officer that got before the jury. The document itself was never published to the jury and didn't go back to the jury room. I think we have cited some cases along those lines that indicate that no prejudice where you do have a cumulative situation here. Every witness that was talked about during that testimony testified at trial. So there was a complete opportunity to exhaust any question that anyone wanted as to that particular witness. Just as to a couple of issues that counsel brought up as to our disclosed expert, Mr. Brennan, I don't believe there should be any question as to his qualifications. Had a CDL for 38 years. Specifically was on construction sites using this particular type of truck. Excuse me, counsel, but your opposing counsel answered my question that he has no problem with his qualifications. But his problem is that today he's arguing that there was no need for that testimony. Because this is the type of testimony that's so obvious and so it's a type of information that any lay person could simply understand. So in response to my question today, he said that he's not challenging the expertise of Brennan. He's challenging the need for that testimony. Your Honor, I guess what we were confronted with was a situation where you have a very complex piece of equipment, for one thing. It weighs 50,000, 60,000 pounds. It's a dump semi. The average person has no idea pretty much what I'm talking about. And that was the problem we had with the jurors. They have a complex mirror system on these trucks for a certain purpose. They've got backup alarms and things like that. It was necessary to bring in an expert so that the jury understood what the standard of care would be for a driver in a construction situation using one of these very large semi dumps. And that's why the expert was used. It is certainly the type of information that is beyond the ken of the average juror. The average juror just does not understand what goes on in a construction site with a vehicle of this size. It was brought in for that purpose. Specifically, as to Brennan, motion in limine filed at the beginning of trial during the course of, and no decision on that. The court reserved ruling on that, wanted everyone to have an opportunity to respond to it. No decision on that. Opening statement given during the opening statement. Brennan's testimony was outlined by us. No objection. No objection when he testified, Your Honor. And the bottom line is there's absolutely no prejudice arising from his testimony because the thrust of his testimony went to the standard of care for that driver. And the primary defendant, the driver of the truck, admitted that it was his responsibility to check, to walk around the truck, to check to make sure it was clear, to get into the truck, to make sure that the mirrors were adjusted. He admitted those things. There can be no prejudice from Mr. Brennan testifying. And it certainly was information that's beyond the account of the average juror. He mentioned too, counsel did, as to the safety manual. This is the JMS safety manual, the manual of the company that was the defendant in this case. Mr. Brennan talked about it. He relied upon it, and that's really why it came in. There was an objection that he should not be able to criticize the manual. Well, as it worked out, that wasn't our purpose, and we did not. Mr. Brennan never criticized the manual. In fact, he adopted certain portions of it, and that was the only reason, that was the only basis for the objection. We stated that we were not criticizing the manual. There was no further objection to the safety manual. I think counsel got into, I'm trying to just cover the matters that he got into today. What about the award? As to the award, if we put it in context, defense counsel argued to the jury during closing argument, that what I had requested was not the important thing, and should not determine what the damages are. In fact, he said that you, you 12, collectively should come up with a figure that you feel is reasonable. And did you request a specific amount? I did, and the jury responded to counsel's argument, because they didn't give me what I requested. I requested $3 million for the pain and suffering. This is constant conscious pain and suffering. And the jury came back with $1 million, certainly within the reasonable range. And what about the other part of the case? What did you request? Did you make a specific request? The other aspect, the losses? Yes, I did. What was that, the 15? It was, Your Honor. And once again, there, we made the request, and counsel addressed that also. Whatever I'm saying, don't, you know, you can disregard that. You find out what it is. They, in fact, did. They disregarded what I said as to both aspects of that request. Requested the 15. They came back with 8. The, as to the conscious pain and suffering, it occurred during the course of the event itself, being run over by this 50-, 60,000-pound vehicle over the midsection. And I won't get overly graphic, but it is probably the worst, one of the worst ways of leaving this earth. A terrible way to die. And I think the jurors appreciated what happened during those minutes. Whether it was four or five minutes, whether it was ten, he was pronounced dead, I think, about an hour later. But we focused on what was conscious pain and suffering. Terrible, terrible injuries. Trying to speak. He couldn't speak. Alert. Eyes focused on his friend who had come up to him. As to the loss of society issue where the jurors returned a verdict of $8 million, this was an individual with almost 22 years of life expectancy. He had three children. Had a mother, and the jury had heard this, lived to 91. Certainly could have believed that he had it even beyond the 22 years. He was in excellent health but for this occurrence. He came from a very, very close family. An immigrant Italian family. They were the type that had Sunday dinner every Sunday together. They played soccer, and he was playing even up to at the time of his death, playing with the family. Very, very close family. His wife of 37 years did not speak English well, and he really was the opportunity for her to communicate in society. And after his passing, her world became much, much smaller. He had a close relationship with his daughter. He had lent her the money to buy the home in the area. She moved in the area so she could see him on a regular basis. In fact, did see him on a daily basis. He built the addition for her. She had three grandchildren. Very, very close, as I mentioned. In addition, Your Honors, the third child was Michael, the youngest, and he was disabled. And his constant companion was his father. Anytime he wasn't at work, Michael was with him. He had many problems, lived at home his entire life, still lives with his mother. After the passing of his father, he began to have, as the jurors heard, began to have many psychological problems because he was so close to his father. I think based on the unique aspects of this particular case, both as to pain and suffering and loss of society, that the verdict that was returned was in the reasonable range. We went in, obviously, as to loss of society with the presumption of substantial loss. There was a very, very substantial loss here, Your Honor, and I believe the verdict was within that reasonable range. Now, do you plan to address the 0% argument regarding a benchmark or is a co-counsel? Well, Your Honor, I was going to defer to counsel on that issue. More appropriately, it is there. We believe that that is an appropriate one. I think the conduct of the driver in this particular case was pretty egregious, and we believe that was a reasonable finding for the jury also. If there are any further questions, I thank the Court for their time. Thank you. Good morning, Your Honor. May I please the Court? Again, my name is Todd Schneider. I represent the third-party defendant benchmark in this case. As I indicated earlier, there are really only two issues that are directed on appeal towards my client, the first being the issue of a defendant's claim of error in the granting of benefits. And that motion in limine was to bar any of the parties from eliciting testimony of the third-party defendant's failure to train, supervise, and or use flaggers on this job site. The crux of the motion was that the standards for training, for supervision, for safety practices in the construction industry are beyond the average keen of a juror. It's something that is outside the scope of the average juror. Most jurors, most individuals have never worked on a construction site. Most jurors do not know what the applicable OSHA standards are or the applicable ANSI standards or the applicable NIOSH standards. Most do not know the custom and practice in the industry as it relates to construction. Most don't know the labor union laws, regulations. As a result, in a case involving allegations of construction negligence, it is necessary to introduce testimony and evidence regarding the appropriate standard of care. The problem for the defendant in this case is that they never disclosed the appropriate witness or any evidence pursuant to Illinois Supreme Court Rules 213, either F2 or F3, as to anyone that would testify as to that applicable standard of care. Understanding that benchmark employees did testify in depositions, for example, that it was their job to supervise, for example. But there was never anyone that was disclosed or anyone that was qualified with a proper foundation to testify as to the applicable standard of care. And, in fact, that that applicable standard of care was breached. This is what was missing from the defendant's case. And so without that disclosed information, there was no way for the defendant to connect the testimony regarding responsibilities with the applicable standard. And as a result, the testimony that they sought to introduce regarding responsibilities was practically barred. I'm confused here. I thought that the question regarding when the trucks leave the site, is it your responsibility as a foreman to make sure it's clear around the truck before they leave? And Cruz answered, well, yes, I'm the competent person on site, so if I'm on site, I'm going to make sure before that truck leaves that that's clear. Was he not asked that question during the course of the trial? He was. And I believe he was asked that question during the course of his deposition. But what wasn't asked, and there was no foundation laid as to whether or not what he did met the appropriate standard of care. I understand that. But was he not also allowed to further argue to the jury that Cruz basically was responsible and failed to do what he was supposed to do? No. Didn't he argue that in his closing argument? Well, he was not doing his job as supervisor. He wasn't doing anything. Well, that goes to the latter point in that he was ultimately, despite the granting of the motion to eliminate, he was ultimately not only allowed to ask questions of Mr. Cruz directly related to his duties and responsibilities, he was also allowed to introduce as an admission deposition testimony of Mr. Cruz regarding his duties and responsibilities. It may not have been called standard of care in legal terms, but nonetheless there was an argument with respect to the care he took, the conduct that he engaged in. I would draw the distinction in that it's one thing to say this was my job duty, this was my responsibility. Let's take flagging, for example. It was my job duty. I don't know that anyone testified that it was their job duty to flag, but let's use that as an example. What you need, that in the abstract doesn't give you very much information. What does the ANSI standard say with regard to how long you have to post somebody there? What does the ANSI standard say or the OSHA standard say with how long that person is supposed to be there, whether it's an open site or a closed site? What about the common law? You're saying because there's been nothing statutory or nothing that's a written manual introduced into evidence, they haven't established a standard of care, but they pled that there was negligence and they had a duty and they pled that there was a duty and the person testifies it's my responsibility to supervise this area. But the problem is that they never laid a foundation as to what is the appropriate standard of care. It's one thing to say this was my responsibility. There was never any testimony as to whether or not he met that responsibility or whether that responsibility was breached because there was no testimony or foundation laid to establish that that duty was breached. You're saying what? Your brief says you have to either put an expert, there's no independent expert witness. It sounds like you're saying there has to be an expert witness in every case to establish a standard of care. Oh, no, no, no, not at all, not at all. I mean, certainly there are... I mean, a standard of care can exist without someone testifying to it. But remember, we're talking about a standard of care that's beyond the average keen of a juror. So we're talking about the construction industry. So you're going to need somebody, whether it's somebody who's been in the construction industry for 20 years, to say I've been working in construction for 20 years, I know what the custom and practice is in the industry, therefore I can offer testimony as to what is the custom and practice in the industry and offer opinions in that regard. That was not done in this case. Do you have any cases that say that in a construction accident that you need an expert to establish a standard of care? Well, I think just the opposite is true. You don't need necessarily an F-3 retained expert. You can have somebody who, an F-2 expert, that can testify. You can, but do you have any cases that say it's mandatory that you've got to have an expert testify as a standard of care in a construction accident? Well, I think any time that you have a subject matter that is beyond the keen of the average juror, that's when you need expert testimony, whether it be somebody who's retained as a liability expert, such as Dennis Buchalski or Phil Colloran or the whole cottage industry of individuals who testify as experts, as F-3 experts, or it's somebody who's worked in the field, who's been in the industry, and can testify as to the custom and practice in the industry. The proper foundation was not laid by the defendants to be able to introduce that in this case. Well, you've lost me. I'm sorry. I mean, I... Well, let me... I'm... Wait a minute. Are you... In your brief, it's saying that... Just help me out here. There's no independent expert to establish, did not disclose, any standards, codes, specifications, statutes, to testify regarding a standard of care. Furthermore, defendants did not disclose any witnesses who testified that they failed to meet the appropriate standard of care. I don't know. Am I... Did I lose you? Did I lose the memo? Are you saying that in a construction case where a guy gets on the witness stand and says, I'm in charge of that site. It's my job to do X. It's my job to flag. It's my job to do this X, Y, or Z, that you need an expert to get up and say, I've worked in the construction area, and that's the guy who's in charge of safety, and he's in charge... Is... I... Do you have any cases that say, in this kind of case, it's mandatory to have an expert to establish... After another person on the site says, it's my job to keep the safety there. This is my job. But now you need an expert to establish who has a standard of care and what the standard of care is? Well, I think that the case law that we cited in our brief addresses those issues.  The plaintiff... Excuse me, the defendant, all of his claimed errors are really hollow in this case because he was allowed to introduce everything that he wanted to get in, despite the motion in limine. Let's go back to where I was about experts. I find it a little interesting that when it came to the plaintiff's experts, everybody said, you don't need this guy. You don't need Brennan. It was so easy. Brennan testified to nothing, basically. And now you're saying, gee, we need an expert to testify as to what the standard of care was. Oh, no. With respect to Brennan, I think that you absolutely needed his testimony. Again, whether the standard of care for driving a truck is something that's beyond the average keen of a juror. I think that not everybody drives a 16-wheeler. Not everybody knows that there are requirements in the CDL or other requirements, but you have to check your mirrors. Not everybody knows that you have to do a walk-around. Not everybody knows that you have to check the bedpan. These are things that you do need expert testimony, and I think Mr. Brennan was well qualified to testify to those things. So not only was the defendant's claims of error, I think, obviated by the fact that notwithstanding the motion to eliminate, he was allowed to proceed and introduce the evidence and make the arguments that he wanted to in closing the argument. But beyond that, he was also, the defendant failed to preserve the issue for appeal because he failed to make an offer of proof. In order to properly preserve the appeal, it would have been incumbent upon him to take the witness outside the presence of the jury and make a proffer of the evidence that he would have elicited from this witness. Failing to do that, he's waived the issue and failed to preserve it for appeal. With respect to the jury's apportionment of liability, it is a, on appeal, it is a standard, the standard is a manifest weight of the evidence. The jury's decision won't be set aside unless it's unreasonable, arbitrary, or not based on the evidence. And this is because the jury is in the best position to observe the witnesses, to assess their credibility, to weigh the evidence, and to resolve any conflicts therein. In this case, given the testimony regarding the duties and responsibilities of the truck driver, those that were admitted to by the defendant, those that were testified to by Mr. Brennan, it was the duty of the driver to conduct a walk-around before he left the job site. It was the duty of the driver to check the bedpan. It was the duty of the driver to check his mirrors before pulling away. The testimony was that had the defendant done any of those things, he would have seen the plaintiff under the truck, and I believe he would not pull away and would not have run over him. I think that given all the circumstances of the case, all the testimony of the case, it cannot be said that the jury's apportionment of liability in this case was against the manifest weight of the evidence. And with that, I would yield the balance of my time to Plaintiff's Counsel. Thank you, Counsel. Anything else? Just a couple of very brief points in reply. First of all, with respect to Benchmark, I believe that we did not need to have an expert witness on the standard of care. We had the supervisor on the site saying he wasn't doing his job. When you have that kind of an admission, it was my position that there was no need to go beyond that. So if you have the supervisor on the job admitting that he didn't do what he was supposed to be doing, that tells the jury that there wasn't reasonable care being exercised, and to not even assess 1% of the fault against Benchmark in that situation is clearly against the manifest weight of the evidence, and it just ignores that testimony completely. Just a couple other comments with respect to the plaintiff. Officer Mullen did read from the report, it shouldn't have been introduced as a business record, it was introduced as a business record, even though it wasn't actually formally introduced until the end of the case, it was used during the case. There were objections during his testimony, and there was a long sidebar about whether this was something that should have been admitted. But the jury didn't see it, right? They didn't see it, no, they did not see it. So where's the prejudice? Well, the prejudice was he was reading from it. So to me it's the same as if he saw it, if they saw it. The other side is saying you didn't object to that. Nobody's objecting, so where's the harm involved? I think that there were objections made, and again, during his testimony there was a long sidebar with all kinds of objections and all kinds of copy between the court and counsel about whether this was a police report, whether it was a business record, whether he could get into it, and the ruling was that if they laid the foundation for a business record, he could get into it. The plaintiff's counsel attempted to lay the foundation, I objected, it was overruled at that point that there was no foundation laid, and then he started getting into it. So no, I didn't object every single time he read something from his report. I did not. And then the last thing I wanted to... I think those are all the points I wanted to make in reply. Thank you. Thank you, counsel. The case was well-briefed and well-argued, so I'll take it under advisement. Thank you.